**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

**EDDIE MILTON GAREY, JR.**                                                      **PLAINTIFF**
**Reg. No. 91876-020**

**v.**                                        **Case No.: 2:17-cv-00117-LPR**

**RHONDA LANGLEY,** *et al.*                                          **DEFENDANTS**

## MEMORANDUM OF DECISION

On February 5, 2018, Plaintiff Eddie Milton Garey, Jr. filed a Second Amended Complaint.[1]  In that Complaint, Mr. Garey brought numerous claims against more than a dozen prison officials and the United States.[2]  Many of those claims were dismissed or otherwise resolved before trial.[3]  The claims that made it to trial were (1) Federal Tort Claims Act ("FTCA") assault and battery claims regarding Quinton White, (2) FTCA negligence, assault, and battery claims regarding Clifford Nichols, (3) a *Bivens* claim against Joseph Peeler, and (4) both a FTCA negligence claim and a *Bivens* claim regarding Stacey Hill.[4]  Between July 20 and July 23, 2021, the Court held a jury trial for the *Bivens* claims and a bench trial for the FTCA claims.  In accordance with Federal Rule of Civil Procedure 52(a), and after reviewing the parties' briefs as well as the entire record, the Court now makes the following findings of fact and conclusions of law regarding Mr. Garey's FTCA claims.

---

[1] Pl.'s Second Am. Compl. (Doc. 78).

[2] The Court appointed Joshua Ashley, a partner at Friday, Eldredge & Clark, LLP, to represent Mr. Garey.  Mr. Ashley has conducted himself consistent with the best traditions and highest ideals of the legal profession.  He did a great service for his client, the judiciary, and opposing counsel.  The Court extends its gratitude to Mr. Ashley and the law firm of Friday, Eldredge & Clark, LLP.

[3] *See* Order (Doc. 421) (adopting in full Proposed Findings and Partial Recommendation (Doc. 401)); Order (Doc. 428) (Adopting the lion's share of Proposed Findings and Partial Recommendation (Doc. 400)).

[4] Order (Doc. 428) at 2–3.

I.      Negligence Claim Regarding Stacey Hill

Mr. Garey claims that Stacey Hill, a prison-staff member whose job was to dispense medication, acted negligently when she knew that Mr. Garey's walker was broken and (1) refused to immediately assist Mr. Garey in obtaining a new or repaired walker, and (2) prevented Mr. Garey from accessing the appropriate medical staff who could help Mr. Garey with his walker.[5] The following witnesses provided testimony at trial regarding this incident: Mr. Garey, Stacey Hill, and TN Sterling.  Mr. Garey is a 57-year-old man who has been in the custody of the Federal Bureau of Prisons since 2003.[6]   Mr. Garey was imprisoned at Forrest City Low Federal Correctional Institution ("Forrest City FCI") from January of 2016 to November of 2018.[7]   Ms. Hill is a medication technician at Forrest City FCI.[8]  Mr. Sterling is a former inmate at Forrest City FCI.[9]  Below are the Court's findings of fact and conclusions of law with respect to this claim.

A.      Findings of Fact

1.      While Mr. Garey was at Forrest City FCI, he was authorized to use a four-wheeled walker.[10]

2.      On October 14, 2016, between 6:30 a.m. and 7:00 a.m., one wheel came off Mr. Garey's walker while he was in the prison dining hall.[11]  This happened because a cotter pin that

---

[5] Pl.'s Second Am. Compl. (Doc. 78) at 5, 28.

[6] July 21, 2021 Tr. of Jury Trial at 28, 30.

[7] *Id.* at 32.

[8] *Id.* at 153.

[9] Mr. Sterling testified that he was at Forrest City FCI "from maybe 2016 to December of 2018." *Id.* at 143.  He confirmed that he was there "during October" of 2016.  *Id.* at 142

[10] *Id.* at 31–32.  Mr. Garey explained that the walker "had a seat on it where you can sit down on it.  It had four wheels on it and it had . . . handles on it with like br[a]ke grips, like bicycle handles you can grip and slow the wheels down." *Id.* at 40–41.

[11] *Id.* at 49.

held the wheel in place broke.[12]  Mr. Garey used a paper clip to hold the wheel in place until he could get to the health services building to request that the walker be repaired or replaced.[13]

3.      After Mr. Garey made the makeshift repair to his walker with the paper clip, he left the dining hall and headed towards the health services building.[14]  Mr. Garey went to the health services building intending to pick up medication and to get his walker fixed.[15]

4.      Despite the defective wheel, Mr. Garey could use the walker to traverse the yard between the dining hall and the health services building.  It was a substantial distance.  Mr. Garey explained that the dining hall is cattycornered from the health services building on the other side of the prison yard.[16]  Defendant's Exhibit 3F (an aerial photo of the prison yard) is a good representation of the configuration and spacing of the buildings.  When Exhibit 3F is oriented so that the writing is the correct side up, the dining hall is the last building on the right before the three prisoners' barracks (the three uniform buildings with white roofs).  The health services building has a white roof and is shown in the bottom left corner of Exhibit 3F.[17]

5.      Inmates enter the health services building through a door accessible from the compound yard.[18]  That door opens into a small room or "lobby" that has a glass service window; the service window is to the left of an interior door that leads further into the health services

---

[12] *Id.*

[13] *Id.* at 49–50.

[14] *Id.* at 48–50.

[15] *Id.* at 53.

[16] *Id.* at 34–35.

[17] Another helpful reference is Defendant's Exhibit 4.  On that exhibit, the dining hall is marked as Zone 2, and the health services building is marked as Zone 7.

[18] Def.'s Ex. 1A.  The entry to health services has two doors.  Inmates use the door on the right.  July 21, 2021 Tr. of Jury Trial at 51.

building.[19]  On a typical weekday, from 7:00 a.m. to 7:15 a.m., Ms. Hill (or another medication technician) dispenses medications to inmates through the service window.[20]  At Forrest City FCI, they call this event "pill line."[21]  For simplicity's sake, the Court will refer to the small entry room as the "pill line room."

6.     Directly across from the entrance door to the pill line room is the interior door (mentioned above) that leads deeper into the building—specifically, to the infirmary.  From 7:15 a.m. to 7:45 a.m.,[22] inmates can go to the infirmary for "sick call," during which time they can tell staff about medical needs and schedule appointments to be seen and treated.[23]  For simplicity's sake, the Court will refer to this location as the "sick call area."

7.     On the day in question, Mr. Garey arrived at the health services building before pill line started—meaning before 7:00 a.m.[24]  Other inmates arrived early for pill line as well.[25]

8.     Prison policy requires Ms. Hill to send inmates away if they arrive before pill line starts, even "[i]f they get there at 6:59."[26]  Ms. Hill explained that "if the inmate[s] show up [to

---

[19] July 21, 2021 Tr. of Jury Trial at 52–53.  *See also* Def.'s Exs. 1B and 1C (photographs of the room behind the inmate entrance to the health services building).  Plaintiff's counsel aptly likened the service window to a "movie ticket window."  July 21, 2021 Tr. of Jury Trial at 158.

[20] *Id.* at 179.  Ms. Hill testified that when pill line starts, "[w]hat I do is I call on the radio and tell the operations or compound officer that I'm standing by waiting for pill line on their call[,] and when they are ready to release [the inmates], they release them to me."  *Id.* at 186.  Ms. Hill will then "go out[side] and get all their [ID] cards."  *Id.* at 162.  Inmates will then come into the pill call room one at a time "because [pill line administrators] have to assure confidentiality in case [inmates] have to discuss their medication."  *Id.* at 182.  Ms. Hill stays behind the window when she dispenses medications.  *Id.* at 158.

[21] *Id.* at 179.

[22] Mr. Garey testified that sick call starts "between 7:15, 7:30.  Give or take a bit."  *Id.* at 62.  He also said that "[f]rom 7:15 to 7:30 is sick call."  *Id.* at 60.  Ms. Hill testified that sick call lasts from 7:15 a.m. to 7:45 a.m.  *Id.* at 179.  The Court finds that Ms. Hill, as a prison staff member working in the medical services building, was in a better position to know when exactly sick call began and ended.  Mr. Garey was less than clear about when sick call took place.  The Court finds that sick call lasted from 7:15 a.m. to 7:45 a.m.

[23] *Id.* at 178–79.

[24] *Id.* at 50.

[25] *Id.*

[26] *Id.* at 157.

4

pill line] before it's time, we are supposed to send them back to their housing units or wherever they came from because they can't just congregate outside a department.  That's how altercations and fights start."[27]

9.      When Mr. Garey got to the health services building, he encountered Ms. Hill.[28]  He "tried to show" Ms. Hill that his walker was broken.[29]  Ms. Hill said "I'm running pill line," "it's not sick call yet," and "I don't care. That's not my problem."[30]  Ms. Hill also "ran everybody away from pill line too because" it was too early and she hadn't "called pill line" yet.[31]

10.     At that time, which was before 7:00 a.m., Ms. Hill locked the entrance door to the pill line room and the door to the sick call area.[32]  There is a sign on the door leading to the sick call area that says something to the effect of "keep door secure at all times."[33]  The sick call staff keeps the door locked when the sick call area is closed.[34]  Ms. Hill is not part of the sick call staff.[35]

11.     Ms. Hill could not have personally obtained a new walker for Mr. Garey.[36]  She does not have access to the equipment room where walkers are stored.[37]  She is not authorized to

---

[27] *Id.*

[28] *Id.* at 50.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 50.  At one point, Ms. Hill testified that Mr. Garey came to the "lobby . . . of [the sick call area] where the inmates sit until their appointment time" after pill line was over on October 14, 2016.  *Id.* at 162–64.  In Plaintiff's Exhibit 9 (Ms. Hill's Response to Request for Admissions), Ms. Hill recalled that Mr. Garey approached her in this sick call lobby area "stating something about his wheelchair." *Id.* at 163.  Mr. Garey remembered this interaction, but he says it took place in March of 2017 and not October 14, 2016.  July 22, 2021 (AM) Tr. of Jury Trial at 9–12.  He explained that he was in a wheelchair during the interaction because his walker had broken and he received a wheelchair as a replacement.  *Id.* at 9–10.  Based on Mr. Garey's testimony and Ms. Hill's references to a wheelchair as opposed to a walker, the Court finds that Ms. Hill misremembered the date of the interaction in the sick call lobby area.  The Court finds that this interaction took place in March of 2017, not October 14, 2016.

[32] July 21, 2021 Tr. of Jury Trial at 55–56, 59.

[33] *Id.* at 165.

[34] *Id.*

[35] *Id.* at 183.

[36] *Id.* at 185.

[37] *Id.* at 174–75, 185.

issue medical equipment (like walkers) to inmates.[38]  Only a physician assistant or doctor can order

a walker.[39]  Nurses (who run sick call)[40] are responsible for issuing or providing the walkers.[41]

Mr. Garey conceded that he had never been given a walker at the pill line because "[t]hat's not

what it's for."[42]

12.     Mr. Garey came back to pill line when it began.[43]  The entrance door to the pill line

room was open but the entrance door to the sick call area was still locked.[44]  He received his

medication sometime between 7:00 a.m. and 7:15 a.m.[45]

13.     Mr. Garey testified that there was "effectively no sick call that day" because Ms.

Hill "locked us out"[46] and "waited [until] the time [for] sick call had expired to give us the

medication."[47]  The Court does not find this characterization credible.[48]  If Mr. Garey's version of

---

[38] *Id.* at 185.

[39] *Id.* at 184.

[40] *Id.* at 183.

[41] *Id.* at 184–85.

[42] *Id.* at 126.  In addition to her pharmaceutical duties, Ms. Hill (along with other prison staff) "is responsible for running to [medical] emergencies."  *Id.* at 155.  Ms. Hill's duties in a medical emergency would be to "help secure the scene, back away other inmates and assist the medical staff arriving with whatever they needed whether it was getting stuff that they need to perform the emergency or just standing back and holding back the crowd."  *Id.*

[43] *Id.* at 60.

[44] *Id.* at 59–61.

[45] Mr. Garey testified that "[w]hen she finally did pill line," Ms. Hill "timed it so it would interfere with sick call." *Id.* at 60.  He said that "finally she called pill line . . . after the time to do sick call had expired."  *Id.* at 61.  This would mean pill line began after sick call ended at 7:45 a.m.  Plaintiff's Exhibit 108 is a medication administration record of the pills that Mr. Garey received from Ms. Hill on the morning in question.  The exhibit is initialed "SMH" and dated 7:38 a.m., October 14, 2016.  *Id.* at 62.  Ms. Hill stays at the pill line "about an hour" after pill line closes at 7:15am to "do [her] reports and stuff."  *Id.* at 194.  She documents the pills she dispenses after "the pill line is completed," and she "usually document[s] it within 30 minutes of completion."  *Id.* at 161.  After viewing Plaintiff's Exhibit 108, Ms. Hill stated that Mr. Garey was in pill line "somewhere between 7:00 and . . . 7:15" and that she "finished pill line and then entered the medication record at around 7:38."  *Id.* at 188.  Mr. Garey claimed that he received the medication at the time listed on the records.  *Id.* at 62.  He noted that "almost all" of times recorded on the other dates were after 7:30 a.m.  *Id.*  Mr. Garey claimed that "[e]very time there's always a problem with her pill line."  *Id.* at 63.  The Court does not find this testimony credible.  Based on the record evidence and the testimony, the Court finds that Ms. Hill conducted pill line and dispensed Mr. Garey's medication between 7:00 a.m. and 7:15 a.m. on October 14, 2016.

[46] *Id.*

[47] *Id.* at 140.

[48] *See supra* note 45.

events were true, pill line would have begun after 7:45 a.m.  But the exhibits and testimony show that pill line actually finished well before 7:45 a.m.[49]  Furthermore, nurses—not Ms. Hill—are responsible for running sick call, including unlocking the door when they are ready for sick call to begin.[50]

14.     Mr. Sterling (another inmate) testified that he encountered Mr. Garey as Mr. Garey was exiting the pill line room.[51]  Mr. Sterling recalled asking Mr. Garey "what's wrong with you?" to which Mr. Garey answered, "she wouldn't let me in and we didn't—wouldn't let me fix my walker."[52]  Mr. Sterling could not recall the time at which this exchange took place.[53]  Mr. Garey testified similarly.[54]

15.     The Court finds Mr. Sterling's testimony untrustworthy.  Mr. Sterling is a felon who was convicted of impersonating a foreign diplomatic officer.[55]  He testified to the details of the offense.  It was not just a run-of-the-mill crime of dishonesty, but one that takes significant guts and repeated and skillful lying to pull off.  Mr. Sterling's demeanor as he testified left the Court uneasy about his truthfulness.  Without independent corroboration (other than the testimony of Mr. Garey), the Court gives Mr. Sterling's testimony no weight.[56]  In any event, even if the

---

[49] *See supra* note 45.

[50] July 21, 2021 Tr. of Jury Trial at 183.  Ms. Hill testified that the door next to the pill line window that led to the sick call area is "normally locked unless they called . . . sick services early or something."  *Id.*  Nurse Hill said that "in general somebody would unlock the door.  Not me because I may never know when that person may be ready for sick call."  *Id.*

[51] *Id.* at 145.

[52] *Id.*

[53] *Id.*

[54] *Id.* at 50.

[55] *Id.* at 148.

[56] Mr. Sterling also testified that Ms. Hill was "known for just denying you service, closing up earlier.  'Go, leave, get.'  She uses words that come out of their mouth or her mouth shall I say."  *Id.* at 146.  For the same reasons described in the main text, the Court does not find this testimony credible or particularly relevant.

Court believed Mr. Sterling's testimony, it is not clear whether the interaction took place prior to pill line, when Ms. Hill sent everyone away, or after Mr. Garey got his pills.

16.     After getting his pills and leaving the health services building, Mr. Garey successfully used his walker to walk to "the area called vocational carpentry."[57]  This was not an insignificant distance.  The distance can be in seen in Defendant's Exhibit 3D, which is a photo taken near the entrance to medical services that shows a substantial length of sidewalk.[58]  A portion of a building with two windows can be seen off in the distance in the photo.[59]  That building is near vocational carpentry.[60]

17.     Mr. Garey took the broken walker to Mr. Huntergrass, a vocational instructor.[61]  Mr. Huntergrass used "some kind of soft nail[]" as a temporary fix for the walker.[62]  Mr. Garey said the soft nail "worked for a few hours.  Maybe the rest of that day and I still had to struggle.  It kept breaking.  Put another piece in.  Break it.  Put another piece in."[63]

18.     Around noon on the following day (October 15, 2016), Mr. Garey left the prison dining hall and was going down a handicapped ramp with his walker.[64]  As Mr. Garey was going down the ramp, the walker's "wheel came lo[o]se," and he "went down pretty hard."[65]  He scraped his arms and knees, hit his chest and hurt his ribs, "stuff got in [his] eyes," and he "got a minor injury to [his] right thumb."[66]

---

[57] July 21, 2021 Tr. of Jury Trial at 64.

[58] *See* Def.'s Ex. 3D.

[59] *Id.*

[60] *Id.*; July 21, 2021 Tr. of Jury Trial at 34.

[61] July 21, 2021 Tr. of Jury Trial at 64.

[62] *Id.*

[63] *Id.* at 64.

[64] *Id.* at 68, 75, 79–80.

[65] *Id.*  at 80.

[66] *Id.* at 80–81.

19.     Mr. Garey was taken to health services after his fall for medical treatment.[67]  Mr. Garey was issued a new walker after his fall.[68]

B.     Conclusions of Law

The United States argues that the doctrine of sovereign immunity bars this negligence claim.  Alternatively, the United States argues that Ms. Hill did not act negligently.  The United States is right on both fronts.

i.     Sovereign Immunity

The parties agree on several propositions of law.  First, the United States enjoys sovereign immunity unless it has specifically waived that immunity.[69]  Second, the FTCA generally waives immunity for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . ."[70]  Third, the FTCA excepts from this waiver negligence claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."[71]  What the parties disagree about is whether the just-referenced exception to the FTCA's waiver of sovereign immunity—commonly known as the discretionary function exception—covers the negligence claim against Ms. Hill.

With certain caveats not relevant to this negligence claim,[72] the discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the

---

[67] *Id.* at 87.

[68] *Id.* at 88–89, 189.

[69] *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998).

[70] 28 U.S.C. § 1346(b)(1).

[71] 28 U.S.C. § 2680(a).

[72] As will be discussed in detail below in Section II(B)(i), a textual analysis of a 1974 amendment to the FTCA leads me to conclude that the United States has affirmatively waived its sovereign immunity for certain intentional torts even if the discretionary function exception would have applied absent the amendment.

United States and its desire to protect certain governmental activities from exposure to suit by private individuals."[73]   "To the extent an alleged act falls within the discretionary function exception, a court lacks subject matter jurisdiction" to hear the resulting negligence claim.[74]  As directed by the United States Supreme Court, courts use a two-step test to determine whether the discretionary function exception bars a negligence claim.[75]

The first step requires a court to determine whether the challenged governmental action is the product of "judgment or choice."[76]  Under this step, a court "must determine whether a statute, regulation, or policy mandates a specific course of action."[77]  If such a mandate exists, the governmental employee has no "discretion" under the statute, and thus "the discretionary function exception does not apply and the claim may move forward."[78]  Where there is no such directive, however, the employee's action or inaction "is considered the product of judgment or choice (i.e., discretionary), and the first step is satisfied."[79]  The second step requires a court to determine if the judgment or choice is based on "considerations of public policy."[80]  If the judgment of the governmental official is based on "social, economic, or political policy" considerations, "then the discretionary function exception applies and the claim is barred."[81]

There is no evidence of a "statute, regulation, or policy" that would have required Ms. Hill to ensure that Mr. Garey was issued a new walker on October 14, 2016.  It is true that Ms. Hill

---

[73] *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).

[74] *Dykstra*, 140 F.3d at 795.

[75] *See Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988).

[76] *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536).

[77] *Dykstra*, 140 F.3d at 795.

[78] *Id.*

[79] *Id.*

[80] *Gaubert*, 499 U.S. at 323.

[81] *Dykstra*, 140 F.3d at 795.

admitted that one of her duties (like many prison officials) "is to respond to medical emergencies" by "secur[ing] the scene, back[ing] away other inmates and assist[ing] the medical staff arriving with . . . getting stuff that they need."[82]   All that means, however, is that if Mr. Garey's broken walker constituted a "medical emergency," Ms. Hill would have been required by prison policy to secure the pill line area, back away other inmates, and assist the medical staff with getting a new walker.   But Mr. Garey has not shown that a walker with a defective wheel definitively constitutes a "medical emergency" under prison policy or regulations.   He does not point to any "statute, regulation, or policy" that would require a prison staff member like Ms. Hill to drop what he or she is doing and immediately respond to a prisoner's complaint about a defective wheel on a walker.

In the absence of such a mandate, determining whether the defective walker was a "medical emergency," and thus whether it necessitated an immediate response, required Ms. Hill to use her discretion.   She had to weigh things like the extent of the damage to the walker, Mr. Garey's ability to continue using it, the staffing of the pill line, and the orderly flow of the prison.   The Court concludes that determining whether the broken walker was a "medical emergency" requiring immediate attention involved "judgment or choice" on the part of Ms. Hill.

"When established policy allows governmental agents to exercise discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'"[83]   Mr. Garey has not rebutted this presumption.   Ms. Hill's judgment or choice was based on "considerations of public policy."   Whether, when, and where to issue a new walker in a prison setting involves social, political, and economic policy considerations.   Prison employees must

---

[82] July 21, 2021 Tr. of Jury Trial at 155.

[83] *Dykstra*, 140 F.3d at 795 (quoting *Gaubert*, 499 U.S. at 322).

ensure that the prison is run safely.  Ms. Hill had to weigh Mr. Garey's need for a new walker against the potential disruption to the administration of the pill line that morning.  As Ms. Hill observed, if pill line (a place where prisoners necessarily must congregate) is not administered in an orderly fashion, it can become a scene for "altercations and fights."[84]  Moreover, prisons have limited staff and resources, and cannot immediately issue a new walker whenever a prisoner demands one.

Both steps of the two-step test are satisfied.  The Court concludes that Mr. Garey's claim regarding Ms. Hill is barred by the discretionary function exception.  In any event, if the discretionary function exception did not apply, the Court would conclude that Ms. Hill did not act negligently in denying Mr. Garey a new or repaired walker.  This conclusion is explained in section ii below.

ii.    Merits

Under the FTCA, the United States is liable "for any negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[85]Accordingly, "[t]o determine the extent of the government's liability under the FTCA, we look to state law . . . ."[86]

"To prevail on a claim of negligence" in Arkansas, "the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injuries."[87]  Ms. Hill was a medical technician.  Her duty

---

[84] July 21, 2021 Tr. of Jury Trial at 157.

[85] 28 U.S.C. § 1346(b).

[86] *White v. United States*, 959 F.3d 328, 332 (8th Cir. 2020).

[87] *Duran v. Sw. Arkansas Elec. Coop. Corp.*, 2018 Ark. 33, at 6, 537 S.W.3d 722, 726 (2018).

to Mr. Garey was to dispense his medication correctly.  It was not to get him a new walker or affirmatively take him to someone who would, absent medical emergency circumstances.  Mr. Garey's testimony makes clear that the walker, though defective, was still functional enough to support him as he walked from the dining hall to pill line.  The defective walker did not rise to the level of a "medical emergency" that would trigger a duty on Ms. Hill to cease preparing for pill call and see to it that Mr. Garey was immediately issued a new or repaired walker.

This is especially true because sick call would soon begin, enabling Mr. Garey to request a new walker through the usual protocol.  As set forth in the findings of facts above (*see supra* at I(A) 12, 13 and notes 45 and 50), Ms. Hill did not prevent Mr. Garey from attending sick call.  Mr. Garey could have gone to sick call instead of pill line or after he got his pills.  It is more likely than not that Mr. Garey got his pills by 7:15 a.m.  But even if Mr. Garey received his medication at exactly the time recorded (7:38 a.m.), this left him with more than five minutes to go to sick call before it ended (7:45 a.m.).  The entrance to the sick call area is directly to the right of the pill call window.  If the door to the sick call area was indeed locked during the sick call period, as Mr. Garey claimed, it was not Ms. Hill's responsibility to unlock it.  She administered pill line, not sick call.  If the health services staff did not unlock the door during sick call, this is not an act of negligence on Ms. Hill's part.

This claim is dismissed because of the United States' sovereign immunity.  If (contrary to the Court's conclusion) immunity is waived, judgment on this claim would be entered in favor of the United States.

II.     Assault and Battery Claims Regarding Quinton White

Mr. Garey claims that Quinton White, a prison correctional officer, committed assault and battery in two ways: (1) by requiring Mr. Garey to try and stand during a security count, which led

to Mr. Garey falling; and (2) by "grabb[ing] and snatch[ing Mr.] Garey up by his arms [and] jerking him up backwards" after Mr. Garey fell.[88]  The following witnesses provided testimony at trial regarding this incident: Mr. Garey, Quinton White, and TN Sterling.  Officer White works at Forrest City FCI.[89]  Below are the Court's findings of fact and conclusions of law with respect to these claims.

A.   Findings of Fact

1.   Mr. Garey was housed in the Marianna Alpha unit at Forrest City FCI.[90]  Policy at this facility requires "counts" of prisoners at 4:00 p.m. and 9:30 p.m.[91]  The 9:30 p.m. count ensures all inmates are "present and accounted for in their cubicles."[92]  All physically capable inmates must stand during these counts.[93]

2.   On the evening of October 16, 2016, Mr. Garey requested protective custody because Officer White threatened to write Mr. Garey up if he did not stand for count.[94]  When making this request, Mr. Garey stated that he had fallen the previous day due to a defective walker, and "he had a scrape on his hand, among other medical problems, and could not stand during count."[95]

---

[88] Pl.'s Second Am. Compl. (Doc. 78) at 27.

[89] July 22, 2021 (PM) Tr. of Bench Trial at 87.

[90] *Id.* at 9.

[91] *Id.* at 27, 94.

[92] *Id.* at 27.

[93] *Id.* at 97.

[94] *Id.* at 9–10.  Inmates can lose privileges if they are written up.  *Id.* at 72.  For instance, inmates can lose phone visits, commissary privileges, and in the case of multiple write ups, inmates can lose credit for good time.  *Id.*

[95] *Id.*

3.      Officer White acknowledges that he told Mr. Garey to stand for count.[96]  Officer White had seen Mr. Garey "walking around the unit with his walker," so he believed Mr. Garey "could stand for count for a minute if he could walk around the unit with his walker."[97]

4.      At about 10:00 p.m on October 16, 2016, Lieutenant Breanna Lonero discussed the "standing-for-count" matter with Mr. Garey.[98]  Lieutenant Lonero advised Mr. Garey that he needed to attempt to stand for count unless he had medical documentation excusing him from standing.[99]  Lieutenant Lonero told Mr. Garey to go to sick call in the morning and tell the medical staff that he was having difficulty standing for count.[100]

5.      Mr. Garey went to sick call the following morning (October 17, 2016), but he was not seen by a physician that morning.  Instead, the staff scheduled an appointment for him to be seen on a later date.[101]

6.      That evening (October 17, 2016), Marianna Alpha unit officers advised Lieutenant Lonero that they again had issues with Mr. Garey not attempting to stand for count.[102]

7.      Lieutenant Lonero checked with medical services, and medical services stated that Mr. Garey had come to sick call that morning (October 17, 2016) and had scheduled an

---

[96] *Id.* at 89.

[97] *Id.*

[98] *Id.* at 10; *see also* Pl.'s Ex. 88-002.

[99] July 22, 2021 (PM) Tr. of Bench Trial at 10, 15; *see also* Pl.'s Ex. 88-002.

[100] July 22, 2021 (PM) Tr. of Bench Trial at 10; Pl.'s Ex. 88-002.  Mr. Garey testified that the following day (October 17, 2016) "would have been a Sunday, I believe," and that sick call would have been closed.  July 22, 2021 (PM) Tr. of Jury Trial at 10–11.  The Court takes judicial notice of the fact that October 17, 2016 was a Monday.  Upon being presented with a memo prepared by Lieutenant Lonero, Mr. Garey clarified later in the testimony that he did in fact go to sick call on the morning of October 17, 2016.  *Id.* at 12; Pl.'s Ex. 88-002.

[101] July 22, 2021 (PM) Tr. of Bench Trial at 34.

[102] *Id.* at 11; *see also* Pl.'s Ex. 88-002.

15

appointment for the following day (October 18, 2016).  Medical services also stated that there was no obvious reason why Mr. Garey could not stand for count.[103]

8.      At about 8:30 p.m. (on October 17, 2016) Lieutenant Lonero spoke with Mr. Garey in her office and told him that medical services said there was no medical reason why Mr. Garey could not stand for count.[104]  Lieutenant Lonero advised Mr. Garey that he needed to try to stand for count.[105]

9.      As Mr. Garey was returning to his unit from Lieutenant Lonero's office, he started having chest pains and was taken to medical services.[106]  Medical services determined that he was fine, and Mr. Garey returned to Marianna Alpha unit.[107]

10.     Shortly after Mr. Garey returned to his cubicle on the evening of October 17, 2016, Officer White began the 9:30 p.m. inmate count.[108]

11.     Inmates in the Marianna Alpha unit sleep in cubicles rather than traditional cells.[109] Four-foot-tall walls separate the cubicles.[110]  Each cubicle has an opening wide enough to fit a wheelchair.[111]  Two inmates share a cubicle.[112]

12.     At the 9:30 p.m. count, inmates stand at the opening of their cubicles, "[f]acing the aisle that the officers walk and not in the aisleway."[113]

---

[103] Pl.'s Ex. 88-002.

[104] *Id.*; July 22, 2021 (PM) Tr. of Bench Trial at 14.

[105] Pl.'s Ex. 88-002; July 22, 2021 (PM) Tr. of Bench Trial at 14.

[106] July 22, 2021 (PM) Tr. of Bench Trial at 18.

[107] *Id.* at 18–19; Pl.'s Ex. 89-002.

[108] July 22, 2021 (PM) Tr. of Bench Trial at 37.

[109] *Id.* at 20.

[110] *Id.*

[111] *Id.* at 21.

[112] *Id.* at 22.

[113] *Id.* at 22, 35, 93.

16

13.     During the 9:30 p.m. count on October 17, 2016, Officer White ordered Mr. Garey to stand for count, and Mr. Garey protested that he could not stand.  Officer White again told him to stand.[114]   Mr. Garey did not indicate that Officer White threatened Mr. Garey with any disciplinary action for not standing during this specific 9:30 p.m. count.

14.     Mr. Garey attempted to stand using his walker.[115]  When Mr. Garey attempted to stand, pressure was exerted on the cut on his hand and a pinched nerve in his leg, and he fell face down on the floor.[116]  Officer White's impression was that Mr. Garey "intentionally f[e]ll" when asked to stand for count.[117]  The Court concludes it is more likely than not that Mr. Garey's fall was real and not intentional.  Officer White did not sufficiently explain the basis for his impression that the fall was intentional.  On this point, Mr. Garey's testimony seemed sincere and credible.

15.     After Mr. Garey fell, Officer White asked an inmate in Mr. Garey's cubicle to help him lift Mr. Garey back up.[118]  They took Mr. Garey by both arms and attempted to lift him.[119]

---

[114] *Id.* at 37.  Officer White's testimony directly contradicts Mr. Garey's account.  *Id.* at 100.  Two officers conduct the counts independently.  On this night, an Officer Lambert began the count in the Marianna Alpha unit.  Officer White trailed behind Officer Lambert.  According to Officer White, as soon as Officer Lambert passed Mr. Garey's cubicle, Mr. Garey fell.  Officer White testified that he then "responded to Inmate Garey" to "ma[k]e sure he was okay."  *Id.*  Officer White drafted an incident report on the night of the incident, which tracked his trial testimony.  Pl.'s Ex. 89-001.  On the whole, though, the Court concludes that Mr. Garey's testimony was more credible and that Officer White ordered Mr. Garey to stand just before Mr. Garey fell.

[115] *Id.*

[116] *Id.* at 39, 44.

[117] Pl.'s Ex. 89-001.

[118] July 22, 2021 (PM) Tr. of Bench Trial at 44.

[119] Officer White denies attempting to pick Mr. Garey up.  *Id.* at 100.  Indeed, Officer White testified that he did not "really recall touching [Mr.] Garey other than seeing him moving around and checking just to make sure he was breathing."  *Id.* at 100–101.  When pressed, Officer White clarified that he did not remember if he touched Mr. Garey.  *Id.* at 101.  Officer White was unable to remember whether he asked another inmate for assistance with Mr. Garey.  *Id.*  Mr. Garey's account of this incident was detailed and seemed credible as to the general fact that Officer White tried to pick him up.  The Court finds that Officer White along with another inmate tried to pick Mr. Garey up.

16.     Mr. Garey did not or could not assist Officer White and the inmate when they tried to lift him up.  Mr. Garey was asked, "[d]id you try to get up with them or were you dead weight so to speak?"  He responded, "[w]hen they grabbed me that was dead weight, yes, sir."[120]

17.     When they attempted to lift him up, Mr. Garey "started screaming," so they put him back down on the floor.[121]  Mr. Garey claimed that they "jerked me back hard and pulled my back."[122]  The Court does not find this testimony credible.  The other inmate was not called to testify by Mr. Garey.  Officer White disputed this description.[123]  On this point, the Court believes it more likely than not that Officer White and the inmate simply tried to normally pick up Mr. Garey off the floor.  Mr. Garey's testimony on this specific point seemed embellished and exaggerated.  There was no corroborating evidence.

18.     After setting Mr. Garey back down on the floor, Officer White called for medical help.[124]  Mr. Garey went to medical services and received a "pain shot."[125]

B.     Conclusions of Law

The United States argues that the doctrine of sovereign immunity bars these assault and battery claims.[126]  In the alternative, the United States argues that Officer White did not commit assault or battery.  The United States is wrong about immunity but right on the merits.

---

[120] *Id.* at 45.

[121] *Id.* at 45.

[122] *Id.* at 44–45.

[123] *Id.* at 100–101.

[124] *Id.* at 45.

[125] *Id.* at 46; *see also id.* at 53 (stating that Mr. Garey received a Toradol injection).

[126] Def.'s Br. Regarding the Discretionary Function Exception (Doc. 437) at 6.

i.      Sovereign Immunity

As explained in Section I(B)(i) above, the parties agree on some general principles. First, the United States enjoys sovereign immunity unless it has specifically waived that immunity.[127] Second, the FTCA generally waives immunity for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . ."[128] Third, the FTCA excepts from this waiver negligence claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."[129] As was true for the negligence claim against Ms. Hill, there is a disagreement between the parties as to whether the alleged conduct of Officer White meets the two-step test for application of the discretionary function.

But there's also a more basic conflict between the parties. Are intentional tort claims like the ones at bar subject to the discretionary function exception at all? Or does the FTCA affirmatively waive sovereign immunity for such claims regardless of whether they meet the discretionary-function-exception test? The Government says the discretionary function exception to the FTCA's waiver of sovereign immunity can apply (and in this case does apply) to intentional tort claims like the ones at bar. Mr. Garey disagrees.

There is a split in authority on whether a 1974 amendment to the FTCA—commonly called the law enforcement proviso—waived sovereign immunity for intentional tort claims like the ones at bar even if the discretionary function exception would have applied in absence of the

---

[127] *Dykstra*, 140 F.3d at 795.

[128] 28 U.S.C. § 1346(b)(1).

[129] 28 U.S.C. § 2680(a).

amendment. [130]  Depending on the granularity of the analysis, the split can fairly be characterized as either a two-way split or three-way split.

The Eleventh Circuit has concluded that the 1974 amendment affirmatively waived sovereign immunity for intentional tort claims like the ones at bar regardless of whether the discretionary function exception would have applied in absence of the amendment.[131]  That Circuit would, in the case at bar, stop the analysis after determining whether the claims fell within the scope of the 1974 amendment.  If they did, the Eleventh Circuit would conclude that sovereign immunity was waived.  On the other side of the split, the Seventh, Fourth, Ninth and DC Circuits have concluded that the 1974 amendment does not prevent the full application of the discretionary function exception from applying to intentional tort claims like the ones at bar.[132]  Those Circuits would, in the case at bar, determine whether sovereign immunity bars these claims by applying the traditional discretionary-function-exception test.

These two starkly competing statutory interpretations are not the only options out there.  The Second and Fifth Circuits have adopted something of a middle-ground approach.  They appear to believe the two provisions can, and thus must, be read harmoniously.[133]  They have endeavored to reconcile the provisions, reading each provision so it does not apply to circumstances where the other provision applies.  It is not clear how they would decide which of the two provisions is most implicated by the facts in the case at bar.

---

[130] *See Joiner v. United States*, 955 F.3d 399, 406 (5th Cir. 2020) (collecting cases).

[131] *See Nguyen v. United States*, 556 F.3d 1244, 1253–54 (11th Cir. 2009) (holding "that to the extent of any overlap and conflict between that proviso and subsection (a), the proviso wins").  *But see Denson v. United States*, 574 F.3d 1318, 1337 n.55 (11th Cir. 20) (in dicta, suggesting a narrow reading of *Nguyen*).

[132] *See Linder v United States*, 937 F.3d 1087, 1089 (7th Cir. 2019); *Gray v. Bell*, 712 F.2d 490, 507–508 (D.C. Cir. 1983); *Gasho v. United States*, 39 F.3d 1420, 1433–34 (9th Cir. 1994); *Medina v. United States*, 259 F.3d 220, 224–26 (4th Cir. 2001).

[133] *See Campos v. United States*, 888 F.3d 724, 731 (5th Cir. 2018); *Nguyen v. United States*, 65 F. App'x 509, 510 (5th Cir. 2003); *Caban v. United States*, 671 F.2d 1230, 1234 (2d Cir. 1982).

The Eighth Circuit has not yet had occasion to take a position (or even hint at one) on this question.  For the reasons discussed below, I come to the same ultimate conclusion as the Eleventh Circuit did: the 1974 amendment affirmatively waived sovereign immunity for intentional tort claims like the ones at bar regardless of whether the discretionary function exception would have applied in absence of the amendment.

The proper endeavor for a judge here is not to try to read the minds of individual members of Congress or even of Congress as a whole.  It is instead to interpret the objective meaning of the actual language passed by Congress and signed by the President (or re-passed by a super-majority of Congress over his veto).  After all, under the Presentment Clause of the United States Constitution, only the actual language that makes it through this process becomes "a law."[134]

How does one determine the objective meaning of the actual language used in a specific text?  Wars have started over less difficult questions.  In the Anglo-American legal tradition, however, centuries of refinement have led to a fairly strong judicial consensus on how to perform objective tests across a wide variety of legal subjects; for better or worse, we employ the idea of the reasonable person.[135]  There's no principled justification to do any differently when performing an objective analysis of the actual language used in a text.

In 1974, what would a reasonable reader—who understood the underlying statute and the events of that time period—understand the language of the amendment (and thus the language of

---

[134] U.S. Const. art. 1, § 7, cl. 2.

[135] *See* Christopher B. Jaeger, *The Empirical Reasonable Person*, 72 ALA. L. REV. 887, 896 & ns. 43, 44 (2021) (acknowledging a raging academic debate as to whether the reasonable person standard arose in 1830s England or can be traced back to 1796) (citing Randy T. Austin, Comment, *Better Off with the Reasonable Man Dead or The Reasonable Man Did the Darndest Things*, BYU L. REV. 479, 480–81 (1992) and Ronald K.L. Collins, *Language, History, and the Legal Process: A Profile of the "Reasonable Man"*, 8 RUT.-CAM. L.J. 311, 312 (1977)).  As these articles and others confirm, the reasonable man standard has persisted over time and across subjects despite a healthy amount of academic criticism targeting the standard.

the entire statute as amended) to mean?[136]   Answering a question like this is not always an easy task.  And, even if the question is properly framed, there is a risk that a judge's analysis—either intentionally or unintentionally—mistakes his or her subjective views about the statute (and the resulting policy) for the objective meaning analysis that is necessary to safeguard our constitutional structure.[137]   Elected and directly accountable representatives make the laws.  Unelected and (for all intents and purposes) unaccountable judges do not.  Over the years, the Supreme Court has provided the lower courts with useful guidance on how to accomplish this task—guidance that goes some way towards preventing judges from substituting subjectivity for objectivity.

The most important rule, of course, is to focus on the actual language used.  But there's a second rule that is nearly as important.  The actual language used cannot be interpreted in isolation from the remainder of the statutory provision and the surrounding statutory provisions.  This is not surprising.   In the interpretation of any text—a statute, a novel, or any other written communication—context is king.  Consider, for example, the following sentence.  "The first competitor lost points because he fell off the bar."  In a vacuum, most if not all of us would conclude that the word "bar" unambiguously refers to a piece of gymnastics equipment.  However, if the sentence was in a novel and followed a description of a dance-off between two drunken men at a local watering hole, most if not all of us would conclude that the word "bar" unambiguously refers to the piece of furniture on which one is served drinks.  As human beings, our ability to

---

[136] *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1755 (2020) (Alito, J., dissenting) (stating that a court's "duty is to interpret statutory terms to 'mean what they conveyed to reasonable people at the time they were written'") (quoting ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 16 (2012) [hereinafter READING LAW]).

[137] One significant strand of academic criticism of the reasonable person standard is based on exactly this premise—affirmatively using or unconsciously allowing the pretense of objectivity to mask a judge's subjective views or biases. *See* Mayo Moran, Essay, *The Reasonable Person: A Conceptual Biography in Comparative Perspective*, 14 LEWIS & CLARK L. REV. 1236 (2010) (discussing the long-held concern that the concept of the reasonable man is nothing "more than just a vehicle for the judge's own beliefs and attitudes").

ferret out the meaning of specific words is (almost always and certainly often) predicated on understanding the relation between the words we are trying to interpret and surrounding words. To give a statute its "ordinary meaning at the time Congress" adopted it, a court should "exhaust 'all the textual and structural clues' bearing on that meaning."[138]

Judges are helped in this endeavor by a set of canons of construction.[139]  The canons are, essentially, rules of grammar, construction, and context that identify how—in most circumstances—people read and write.  This does not mean that religiously following the canons will lead to a correct interpretative result every time.  (Indeed, sometimes two applicable canons even point in opposite interpretive directions.)  Rather, it means that where an interpretive result is inconsistent with one or more canons of construction, judges should scrupulously examine that result to ensure there is some relatively unique textual justification for the result.  The canons are an aid for determining ordinary meaning, not a substitute for that determination.

Before examining the disputed language, for the reasons just discussed it is necessary to understand the statutory scheme as written.  I start with 28 U.S.C. § 1346(b)(1), which provides that

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

---

[138] *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) (quoting *Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)).

[139] *See* READING LAW.

Section 1346(b)(1) clearly makes this jurisdictional grant (and waiver of sovereign immunity) "[s]ubject to the provisions of chapter 171 of this title . . . ."[140]  "[S]ubject to" means "affected by or possibly affected by."[141]  So one would expect "the provisions of Chapter 171" to affect or control the scope and terms of the government's waiver and jurisdictional grant.  Lo and behold, this expectation is borne out.

Aside from a definitional section (28 U.S.C. § 2671), the provisions of Chapter 171 address a number of different aspects of claims that might be brought under the jurisdictional grant and waiver of sovereign immunity in 28 U.S.C. § 1346(b).  These provisions include: procedures on settlement of such claims (§§ 2672, 2673, and 2677); limitations on the United States' liability for such claims and a provision for certain immunity defenses to such claims (§ 2674); a requirement of administrative exhaustion of such claims (§ 2675); an announcement that a judgment on such claims operates as a bar to an action against the government employee on the same subject matter (§ 2676); a limitation on attorney's fees chargeable or recoverable for such claims (§ 2678); and an announcement that the remedies provided by Title 28 of the United States Code are the exclusive remedies available (§ 2679).

This brings us to the last statutory section in Chapter 171: 28 U.S.C. § 2680.  It is titled "Exceptions."  It contains the hotly disputed language at the center of the sovereign immunity issue.  So it is worth reproducing in full as it currently reads.  Because it is fairly long, I have bolded portions that I believe are important to the analysis.

**The provisions of this chapter and section 1346(b) of this title shall not apply to—**

---

[140] 28 U.S.C. 1346(b)(1).

[141] *Subject to*, MERRIAM-WEBSTER.COM, HTTPS://WWW.MERRIAM-WEBSTER.COM/DICTIONARY/SUBJECT%20TO (last visited September 13, 2021).  The Court has found nothing to indicate that the phrase "subject to" means anything differently today than it did in 1974.

(a) **Any claim** based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or **based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.**

(b) Any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter.

(c) Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer, except that the provisions of this chapter and section 1346(b) of this title apply to any claim based on injury or loss of goods, merchandise, or other property, while in the possession of any officer of customs or excise or any other law enforcement officer, if—

> (1) the property was seized for the purpose of forfeiture under any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense;

> (2) the interest of the claimant was not forfeited;

> (3) the interest of the claimant was not remitted or mitigated (if the property was subject to forfeiture); and

> (4) the claimant was not convicted of a crime for which the interest of the claimant in the property was subject to forfeiture under a Federal criminal forfeiture law.

(d) Any claim for which a remedy is provided by chapter 309 or 311 of title 46 relating to claims or suits in admiralty against the United States.

(e) Any claim arising out of an act or omission of any employee of the Government in administering the provisions of sections 1–31 of Title 50, Appendix.

(f) Any claim for damages caused by the imposition or establishment of a quarantine by the United States.

[(g) Repealed. Sept. 26, 1950, ch. 1049, § 13 (5), 64 Stat. 1043.]

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: **Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title**

25

**shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.**

(i) Any claim for damages caused by the fiscal operations of the Treasury or by the regulation of the monetary system.

(j) Any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.

(k) Any claim arising in a foreign country.

(l) Any claim arising from the activities of the Tennessee Valley Authority.

(m) Any claim arising from the activities of the Panama Canal Company.

(n) Any claim arising from the activities of a Federal land bank, a Federal intermediate credit bank, or a bank for cooperatives.

Section 2680 starts out with the words "the provisions of this chapter and section 1346(b) shall not apply to" and then provides a long list of claims. Interpreting this opening phrase—particularly the words "the provisions of this chapter and section 1346(b)"—is critical. It is critical because Congress used the same language in 1974, when it added the law enforcement proviso to subsection (h) that is at issue in this case. And an important canon of construction tells us that "there is a natural presumption that identical words used in different parts of the same acts are intended to have the same meaning."[142] This canon seems especially valuable where, in amending a statute, Congress chooses to use a specific phrase that is already in the original statute.

In the opening phrase of § 2680, "the provisions of this chapter and section 1346(b)" is most naturally read to mean §§ 2671–2679 and § 1346(b). Put another way, "the provisions of

---

[142] READING LAW, at 170 (citing *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). This canon is known as the "Presumption of Consistent Usage." *Id.*

this chapter and section 1346(b)" is most naturally read as a reference to the jurisdictional grant and waiver of sovereign immunity in §1346(b) and the rules governing such claims laid out in §§ 2671–2679.  Because § 2680 was—as originally passed and signed—simply a list of claims excluded from the waiver of sovereign immunity, it wouldn't make sense to read "the provisions of this chapter" language in the opening phrase of § 2680 as including a self-referential meaning. It would be circular in the extreme if the opening phrase "the provisions of this chapter . . . shall not apply to" included itself as one of those provisions that do not apply.  It would mean that, if a claim on the § 2680 Exclusions list was brought, the claim wouldn't actually be excluded from the sovereign immunity waiver because § 2680 would be one of the provisions that did not apply. Such a reading is perhaps the perfect (and rare) example of an actual transgression of the presumption against ineffectiveness canon.[143]

Now on to the 1974 amendment.  As of 1973, the Exclusions list in § 2680 included "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."  That partially changed in 1974.  As the Supreme Court tells it:

> In 1974, Congress carved out an exception to §2680(h)'s preservation of the United States' sovereign immunity for intentional torts by adding a proviso covering claims that arise out of the wrongful conduct of law enforcement officers.  Known as the "law enforcement proviso," this provision extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the "acts or omissions of investigative or law enforcement officers."  The proviso defines "investigative or law enforcement officer" to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."[144]

I reproduce the current subsection (h) below, with the 1974 amendment language bolded.

---

[143] READING LAW, at 63.

[144] *Millbrook v. United States*, 569 U.S. 50, 52–53 (2013) (internal citations omitted) (citing Pub. L. 93-253, § 2, 88 Stat. 50).

 (h)   Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights**: Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.**

The law enforcement proviso clearly states that "the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." There is no textual or grammatical justification for ascribing a meaning to the phrase "the provisions of this chapter and section 1346(b) of this title" that is different from the meaning ascribed to the same phrase located at the outset of the Exclusions list. As explained above, "[t]he provisions of this chapter and section 1346(b)" is most naturally read to mean §§ 2671–2679 and § 1346(b). Put another way, "the provisions of this chapter and section 1346(b)" is most naturally read as a reference to the jurisdictional grant and waiver of sovereign immunity in § 1346(b) and the rules governing such claims laid out in §§ 2671–2679. On this understanding, the proviso states that the jurisdictional grant and waiver of sovereign immunity in § 1346(b) applies to "any claim" that meets the proviso's elements. It's an affirmative waiver of sovereign immunity.

The best argument against this reading is a structural one. It must be acknowledged that the law enforcement proviso is tucked away in subsection (h) of the Exclusions list as opposed to being a separate section of the statutory provision. It's not unreasonable to argue this placement of the proviso suggests the proviso was simply an attempt to reduce the scope of the original subsection (h) exclusion as opposed to an affirmative waiver of sovereign immunity for the claims

in the proviso.  Subsection (h) originally excluded from the sovereign immunity waiver "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."[145]  If the proviso were simply meant to eliminate one or more of these claims from the Exclusions list, that elimination would not prevent the application of the discretionary function exception to the claim.

For example, let's say the 1974 amendment had simply deleted the words "assault" and "battery" from the original subsection (h).  In such circumstances, the resulting statute would allow the application of the discretionary function exception to assault and battery claims.  The argument would be, essentially, that the proviso is the equivalent of this type of deletion.  The reason the amendment could not simply delete words—so the argument would go—is that the intended deletion was not of a full claim or full claims (e.g., all assault and battery claims) but rather only specific parts of claims (e.g., assault and battery claims against an investigative or law enforcement officer).

Here's the problem with that argument.  The structure of the statute does not preclude the proviso-as-affirmative-waiver interpretation of the statute.  Indeed, the structure of the statute does not even strongly counsel against the proviso-as-affirmative-waiver interpretation.  It is certainly true that Congress could have separated out an exclusions and inclusions list.  But it is either as reasonable or nearly as reasonable for Congress to have lumped exclusions and inclusions together by topic.  In short, the structural placement of the proviso does not undermine the language-based clues that tell me the 1974 was an affirmative waiver of sovereign immunity for those claims that fall into the scope of the proviso to subsection (h).

---

[145] Federal Tort Claims Act, Pub. L. No. 79-601, 60 Stat. 842, 845–46 (1946).

The foregoing analysis essentially leaves us with two potentially dueling provisions of law in the same statutory section:

- The provisions of this chapter and section 1346(b) of this title shall not apply to any claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function . . . .[146]

- [W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising . . . out of assault [or] battery . . . .[147]

In laymen's terms, the FTCA permits "any claim" involving assault or battery committed by law enforcement officers, and it prohibits "any claim" involving discretionary functions committed by government employees. If an alleged assault or battery by a law enforcement officer involves an element of discretion, then the two provisions would conflict.

The Supreme Court has given lower courts the tools to deal with dueling statutory provisions. "[S]pecific statutory language should control more general language when there is a conflict between the two."[148] The law enforcement proviso is the more specific provision in this context. It is narrower than the discretionary function exception both in terms of scope (a limited number of specific, law enforcement-related intentional torts versus any action involving discretion) and in terms of target (a defined subset of federal law enforcement officers versus any type of federal employee). Just as important as the specific vs. general analysis, where a "later

---

[146] 28 U.S.C. § 2680(a).

[147] *Id.* § 2680(h). An "investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* § 2680(h). The United States does not argue that correctional officers like Officer White are not covered by this definition. In a case where the United States conceded that "correctional officers qualify as 'investigative or law enforcement officers' within the meaning of the FTCA," the Court proceeded to apply the law enforcement proviso while "express[ing] no opinion" as to whether correctional officers actually fall under the proviso. *Millbrook*, 569 U.S. at 55 n.3. The Court will follow the Supreme Court's example here.

[148] *Nat'l Cable & Telecommunications Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002).

statute directly conflicts with an earlier statute, the later enactment governs."[149]  The original 1946 version of the FTCA had both the discretionary function exception and the intentional tort exception.[150]  In 1974, apparently responding to controversial "no-knock" raids by undercover federal drug enforcement agents,[151] Congress added the proviso at issue here to the subsection dealing with intentional torts.[152]  To the extent the 1974 law enforcement proviso and the 1946 discretionary function exception conflict, the "earlier, general provisions" of the discretionary function exception must yield to the "subsequent, more specific provisions" of the law enforcement proviso.[153]

Although the Supreme Court was answering an entirely different question than the one at bar, I read the *Millbrook* decision as at least supportive of my textual interpretation.  In *Millbrook*, the Supreme Court said that "the FTCA waives the United States' sovereign immunity for certain intentional torts committed by law enforcement officers."[154]  The Supreme Court explained that the law-enforcement proviso "extends the waiver of sovereign immunity to claims for six intentional torts . . . that are based on the acts or omissions of investigative or law enforcement officers."[155]  The Supreme Court described the law enforcement proviso as "Congress [speaking]

---

[149] *Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring).  *See also Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 582 n.18 (1971) ("In the event of irreconcilable conflict between the policies of the earlier, general provisions of the Norris-LaGuardia Act and those of the subsequent, more specific provisions of [section] 2 First, the latter would prevail under familiar principles of statutory construction.").

[150] Federal Tort Claims Act, Pub. L. No. 79–601, 60 Stat. 842, 845–46 (1946).

[151] *See Sutton v. United States*, 819 F.2d 1289, 1295–96 (5th Cir. 1987).  Footnote 11 in the *Sutton* opinion collects sources that confirm the amendment was passed after several controversial "no-knock" raids by undercover federal drug enforcement agents.  While it would not be appropriate for a judge to use sources like a Senate Committee report to ascribe a meaning to statutory text that differs from the ordinary meaning of the text, it can be appropriate to use such sources (generally with independent confirmation) to identify the historical facts or events that were taking place at the time of the adoption of the statutory text

[152] Act of March 16, 1974, Pub. L. No. 93–253, 88 Stat 50.

[153] *Chicago & N. W. Ry. Co.*, 402 U.S. at 582 n.18.

[154] *Millbrook*, 569 U.S. at 54.

[155] *Id.* at 50.

directly to circumstances in which a law enforcement officer's conduct may expose the United States to tort liability."[156]  These are pretty absolute statements, and they at least suggest that the proviso-as-affirmative-waiver is the right interpretive result.

The Supreme Court spent five long paragraphs explaining, with regard to claims falling into the law enforcement proviso, that the FTCA does not "further limit[] the category of acts or omissions that trigger the United States' liability."[157]  The Supreme Court said that "[t]he plain language of the law enforcement proviso" tells us "when a law enforcement officer's acts or omissions may give rise to an actionable tort claim under the FTCA," and that "[n]othing in the text further qualifies the category of acts or omissions that may trigger FTCA liability."[158]  The Supreme Court rejected "additional limitations" that "[a] number of lower courts ha[d] nevertheless read into the text" and were "designed to narrow the scope of the law enforcement proviso."[159]  "Had Congress intended to further narrow the scope of the proviso," the Supreme Court explained, it could have done so explicitly.[160]

In short, the Supreme Court acknowledged the breadth of the language of the affirmative waiver of sovereign immunity that arises from the text of the law enforcement proviso.  And it has told the lower courts not to undermine the breadth of that language unless there is a clear textual justification for doing so.  I do not believe there is a clear textual justification for using the discretionary function exception to cabin the language of the law enforcement proviso.  As the Fifth Circuit acknowledges, "[i]f the law enforcement proviso is to be more than an illusory—now

---

[156] *Id.* at 56–57.

[157] *Id.* at 54–57.

[158] *Id.* at 55 (internal citations omitted).

[159] *Id.* at 55–56.

[160] *Id.* at 57.

you see it, now you don't—remedy, the discretionary function exception cannot be an absolute bar which one must clear to proceed under § 2680(h)."[161]

There is a "parade of horribles" objection to this interpretation.  For example, some argue that treating the law enforcement proviso as an affirmative waiver of sovereign immunity will allow claims of intentional torts against law enforcement officers even if those claims arise in a foreign country (*see* § 2680(k)) or arise out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war (*see* § 2680(j)).  This objection is not a winner. First, the resolution-of-conflicting-statutes principles might play out differently.  One could plausibly see the specific vs. general analysis leading to a different result.  Second, even assuming the analysis played out the same way it does here, the policy result is a function of the language of the text passed by Congress and signed by the President.  What gives me—an unelected judge— the authority to alter the ordinary meaning of the language used in the 1974 amendment based on divinations about what Congress was trying to achieve?  The answer is nothing gives me that authority.  I don't have that authority.

A healthy respect for the views of my judicial aunts and uncles who sit on circuit courts outside the Eighth Circuit counsels at least a brief explanation for my decision to part ways what so far appears to be the majority position.[162]  Let me start with *Linder*, which is perhaps the most severely competing textual interpretation to the one I have performed.[163]  In my view, the panel

---

[161] *Sutton*, 819 F.2d at 1297.

[162] I am not going to go through each contrary opinion.  Rather, I will discuss a few representative examples.

[163] 937 F.3d at 1088–89.  For a committed textualist, there is a good deal of pause associated with finding that your interpterion of a statute is completely at odds with the interpretation espoused by Judge Frank Easterbrook.  But I find solace in Judge Easterbrook's wise words in another context: "The textualist method of interpretation cannot produce judicial unanimity across the board, however. . . .  Imagine a Supreme Court comprising Justice Scalia and eight near clones.  That Court would find lots of cases to be hard; this book shows the sorts of interpretive issues that might cause the Justice Scalia of 2011 to disagree with the Justice Scalia of 2012.  It would grant review of those hard cases and decide many of them five to four (Scalia I to V versus Scalia VI to IX)."  READING LAW, at xxiv–xxv.

misinterpreted the most important phrase in the law enforcement proviso—the phrase "the provisions of this chapter shall apply . . . ."  The panel concluded that the "provisions of this chapter" included the full Exclusions list in § 2680 itself.  But, as explained above, that phrase was used earlier in the same statute and the earlier use could not possibly have included the Exclusions list in § 2680 itself.  The panel's opposite conclusion as to the meaning of the phrase "the provisions of the chapter" in the law enforcement proviso arises from the panel's attempt to interpret the words in isolation from the remainder of the language in § 2680 and other related provisions.

Next let's consider *Gasho* from the Ninth Circuit.[164]  In my view, the analysis is based on and infected by a faulty premise.  The panel there said that "statutes waiving sovereign immunity . . . must be 'construed strictly in favor of the sovereign.'"[165]  But that's not accurate when the FTCA is involved.  The Supreme Court has repeatedly made clear that "the general rule that 'a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign'" does not apply in the FTCA context.[166]  Indeed, the Supreme Court has "narrowly construed exceptions to waivers of sovereign immunity where that was consistent with Congress' clear intent, as in the context of the 'sweeping language' of the [FTCA]."[167] And the Supreme Court has cautioned that "unduly generous interpretations of the exceptions [to the FTCA] run the risk of defeating the central purpose" of the FTCA.[168]  To avoid such an outcome,

---

[164] 39 F.3d at 1420.

[165] *Id.* at 1434 (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951)).

[166] *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491 (2006) (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)).

[167] *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (quoting *United States v. Yellow Cab Co.*, 340 U.S. 543, 547 (1951)).

[168] *Dolan*, 546 U.S. at 491–92 (quoting *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984)).

a court must "identify 'those circumstances which are within the words and reason of the exception'—no less and no more."[169]

Finally, let's consider *Sutton*, where the Fifth Circuit adopted the harmonization approach.[170]  It's worth noting that the case supports (as opposed to refutes) my view that the law enforcement proviso is an affirmative grant of sovereign immunity.  *Sutton* appears to acknowledge that the discretionary function exception cannot be used to prohibit a claim that falls within the law enforcement proviso.  Where *Sutton* and I part company is *Sutton*'s implicit position that the law enforcement proviso and the discretionary function exception should be judicially harmonized such that one never invades the province of the other.  Of course, statutory provisions should be read so as not to conflict if each statutory provision can reasonably bear such meaning.[171]  But these two provisions cannot be harmonized so there is never any overlap—at least not without doing damage to the meaning of one provision or the other.  The harmonious construction canon is not license to artificially and unnaturally narrow or expand the scope of either provision.  Sometimes statutory provisions conflict, especially where a later amendment is at issue.  When they do, we have canons to handle the conflict, and these canons tend to reflect what a reasonable reader would understand the amendment (and statute as amended) to mean.

The legal question just analyzed is not just some academic debate.  The stakes are high when the question is whether a citizen can get his or her day in court to recover money damages from his or her government because a government official assaults or batters him or her.  The

---

[169] *Kosak*, 465 U.S. at 853 n.9 (quoting *Dalehite v. United States*, 346 U.S. 15, 31 (1953)).  Another problem with *Gasho*—perhaps a symptom of the faulty strict construction premise or perhaps just a symptom of the Ninth Circuit's general approach to statuary interpretation in the 1990s—is that the Ninth Circuit was very clearly focused on what it believed to be "Congress' intent" as opposed to the actual statutory language.

[170] 819 F.3d at 1298–99.

[171] *See* READING LAW, at 180 (stating that "[t]he provisions of a text should be interpreted in a way that renders them compatible").

discretionary function exception is quite broadly worded; both courts and the government interpret it to cover a large swath of claims. If the discretionary function exception trumps or cabins the scope of the law enforcement proviso, many victims of intentional torts at the hands of law enforcement officers will be prevented from suing their government for monetary damages.[172] Concern about the potential sweep of the discretionary function exception cannot infect the interpretive analysis of the 1974 amendment and the resulting relationship between the law enforcement proviso and the discretionary function exception. Striking the right balance on waivers of sovereign immunity is wholly within the policy province of Congress and the President. Indeed, it is precisely where the policy implications are this grave that judges must be careful to

---

[172] Consider a recent FTCA case where the discretionary function exception applied to prevent a lawsuit by a plaintiff who was shot under the following circumstances: federal agents sold a gun to a terrorist sympathizer, an undercover FBI agent communicated with a second terrorist sympathizer about a planned attack, and that FBI agent caravanned with the two terrorists (driving in a second car behind the FBI agent) just before they opened fire on an unsuspecting crowd. *Joiner*, 955 F.3d at 402–03. Or consider that the discretionary function exception prevented a lawsuit by the Branch Davidians against the federal government arising from "the government's planning of the siege—i.e. the decisions to use tear gas against the Davidians; to insert the tear gas by means of military tanks; and to omit specific planning for the possibility that a fire would erupt . . . ." *Andrade v. Chojnacki*, 338 F.3d 448, 452 (5th Cir. 2003). The trial court dismissed these claims under the discretionary function exception even while acknowledging they partially came within the ambit of the law enforcement proviso. *Andrade v. Chojnacki*, 65 F. Supp. 2d 431, 467 (W.D. Tex. 1999) ("Even though a claim may fall within the law enforcement proviso, it may, nevertheless, still be barred by the discretionary function exception. Therefore, to the extent that Plaintiffs classify their claims relating to the planning of the raid, stand-off, or final assault as falling within the law enforcement proviso, they are still barred by the discretionary function exception because they involve the permissible exercise of law enforcement policy judgment."). Less than two months after the court granted the motion to dismiss on those claims, the federal government disclosed that it fired pyrotechnic tear gas canisters at the Waco compound before it burned to the ground, killing over 50 adults and 25 children. Stephen Labaton, *Reno Admits Credibility Loss In Waco Case*, N.Y. TIMES, Aug. 27, 1999, https://www.nytimes.com/1999/08/27/us/reno-admits-credibility-loss-in-waco-case.html; Press Briefing, Weekly Media Availability with Attorney General Janet Reno, Justice Dept., Aug. 26, 1999, https://www.justice.gov/archive/ag/speeches/1999/avail82699.htm. It is one thing to lose on the merits of such claims. But that's not what we are talking about. What we are talking about is the wholesale prevention of a citizen from even raising the claim.

The government has been even more forward-leaning on the scope of the discretionary function. It has argued that the discretionary function exception provided immunity for the FBI "fram[ing] the scapegoats for a capital crime and covering up the frame job by withholding exculpatory information from state officials," ultimately resulting in innocent defendants being sentenced to death. *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009). And in *Nguyen v. U.S.*—the first case where a circuit court held that the law enforcement proviso trumps the discretionary function exception—the government claimed immunity under the discretionary function exception for the DEA obtaining an arrest warrant based on an affidavit the agency knew to be false, then barging into a doctor's office run by an elderly Vietnam War refugee, arresting him in front of his patients, and ruining his reputation and medical practice. *Nguyen*, 556 F.3d at 1247–49. The government was successful at the district court level. *Id.* at 1250.

restrain themselves by doing no more than declaring the ordinary meaning of the language passed by Congress and signed by the President.  That is what I have tried to do above.

Mr. Garey's assault and battery claims against Officer White fit within the scope of the law enforcement proviso.  So, the discretionary function exception does not apply to them.

ii.   Merits

Mr. Garey argued that Officer White "telling [Mr. Garey] to stand up on pain of being disciplined knowing he was in apprehension of falling" constituted assault, and that picking him up roughly constituted battery.[173]  Arkansas law defines assault as follows:

> an intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery.[174]

The Court concludes that the threat to "discipline" Mr. Garey for failing to stand for count did not constitute an assault.  Mr. Garey testified that Officer White had threatened to "write him up" for failing to stand for count on the previous night.[175]  Mr. Garey conceded that writing someone up for disobeying orders was "part of Bureau of Prison policy."[176]  There is absolutely no evidence that Officer White was threatening "to commit a battery" if Mr. Garey did not stand for count.  And there is no evidence Officer White was attempting "to do an injury" to Mr. Garey either.  None of the disjunctive assault definitions are met by the facts adduced at trial.

---

[173] July 23, 2021 (4:00 p.m.) Tr. of Bench Trial at 12.  The transcript reads "I think the argument is telling him to stand up on pain of being disciplined knowing he was in apprehension of falling constitutes a battery but the assault is from the picking up.  That's the contact."  *Id.*  Since the elements of assault include "threatening" behavior and the elements of battery include "physical contact," the Court believes Mr. Garey's counsel mistakenly characterized the threat of discipline a "battery" and the physical contact from picking up Mr. Garey an "assault."

[174] *Costner v. Adams*, 82 Ark. App. 148, 156, 121 S.W.3d 164, 170 (2003).

[175] July 22, 2021 (PM) Tr. of Bench Trial at 10, 81.

[176] *Id.* at 81.

Arkansas law defines battery as "a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person."[177]   The Arkansas Supreme Court has held that a law enforcement officer "may exert such physical force as is necessary on the one hand to effect the arrest by overcoming the resistance he encounters, or on the other to subdue the efforts of the prisoner to escape."[178]   The use of physical force necessary to control a detainee does not constitute a tort under Arkansas law, even when the use of such force results in injury to the detainee.[179]

The Court finds credible Officer White's testimony that he believed that Mr. Garey "intentionally f[e]ll."[180]  (This is likely considering the antagonistic back-and-forth arguments Mr. Garey and Officer White had for at least two days concerning standing for count.)  Mr. Garey made no effort to assist Officer White and the other inmate in getting him up off the floor.  Mr. Garey described himself as "dead weight" when Officer White and the inmate attempted to lift him up.[181]  Mr. Garey also did not tell the Officer to pick him up.  Faced with an uncooperative inmate, Officer White was entitled under Arkansas law to "exert such physical force as is necessary" to control Mr. Garey.  The Court does not find that Officer White's actions in picking Mr. Garey up off the floor constituted "wrongful or offensive physical contact" or an "unpermitted application of trauma."  As soon as Mr. Garey began screaming, Officer White put him back down on the floor.

---

[177] *Costner*, 82 Ark. App. at 156, 121 S.W.3d at 170 (2003).

[178] *Crouch v. Richards*, 212 Ark. 980, 982, 208 S.W.2d 460, 462 (1948).

[179] *Id.*

[180] Pl.'s Ex. 89-001.  Even though the Court concluded above that Mr. Garey did not intentionally fall, the Court credits Officer White's testimony that Officer White honestly believed Mr. Garey intentionally fell.

[181] July 22, 2021 (PM) Tr. of Bench Trial at 45.

Mr. Garey notes that Officer White was violating policy by asking another inmate to help. That may be. But it does not turn the touching into a battery. This is especially true given the Court's factual finding that neither Officer White nor the inmate jerked Mr. Garey up or did anything other than try to normally pick him up off the floor. Mr. Garey has failed to prove that Officer Nichols committed battery.

III.    Claims of Negligence and Assault and Battery Related to Officer Nichols

Mr. Garey alleges that Clifford Nichols, a prison correctional officer, committed acts of negligence and assault and battery by (1) placing a pair of handcuffs on Mr. Garey too tightly and behind his back, and (2) lifting Mr. Garey up by the handcuffs.[182] Mr. Garey and Officer Nichols provided testimony at trial regarding this incident. Officer Nichols works at Forrest City FCI.[183] Below are the Court's findings of fact and conclusions of law with respect to these claims.

A.    Findings of Fact

1.    On the evening of October 17, 2016, at some point after he fell during count, Mr. Garey was taken to the Special Housing Unit ("SHU") at Forrest City FCI.[184] Lieutenant Breanna Lonero took Mr. Garey to his cell in the SHU in a wheelchair. However, she took the wheelchair with her after she left Mr. Garey in his cell.[185]

2.    Mr. Garey said that Lieutenant Lonero "left [him] on the floor."[186] The Court does not find that specific testimony credible. Mr. Garey has a motive to embellish. His demeanor

---

[182] Pl.'s Second Am. Compl. (Doc. 78) at 26, 28. The Second Amended Complaint refers to Officer Nichols as "John Doe." *Id.* Mr. Garey later identified the John Doe defendant as Officer Nichols. July 22, 2021 (PM) Tr. of Jury Trial at 82.

[183] July 22, 2021 (PM) Tr. of Bench Trial at 114.

[184] *Id.* at 56–58.

[185] *Id.* at 56–57.

[186] *Id.* at 56, 58.

suggested embellishment in this part of his testimony.  Moreover, there is simply no logical reason that Lieutenant Lonero would leave Mr. Garey on the floor.

3.      The next morning, when Mr. Garey was attempting to get off his bunk to retrieve a meal, he fell and got "pinned" in the space between his bunk and the shower.[187]

4.      Eventually, Officer Nichols walked past Mr. Garey's cell and noticed Mr. Garey lying face-down on the floor with his arms underneath his stomach.[188]

5.      Officer Nichols tried to figure out why Mr. Garey was on the floor and began talking to him.[189]  Officer Nichols asked Mr. Garey if he could get up, and Mr. Garey responded that he could not get up because he was stuck.[190]

6.      The Bureau of Prisons' restraint policy allows the use of restraints, like handcuffs, "in situations requiring precautionary restraints, particularly in the movement or transfer of inmates . . . ."[191]

7.      Other officers soon arrived at the scene.  Mr. Garey specifically recalled that at least one other officer joined Officer Nichols and conceded that there may have been "three or four."[192]

8.      Recall that Mr. Garey was lying face-down.  Officer Nichols pulled Mr. Garey's arm out from underneath his body.  When he did, Mr. Garey said "I got a pass,"[193] referring to a

---

[187] *Id.* at 60.

[188] *Id.* at 60–61.

[189] *Id.* at 62.

[190] *Id.*

[191] Pl.'s Ex. 49-002.

[192] July 22, 2021 (PM) Tr. of Bench Trial at 62.

[193] *Id.*

medical pass stating that Mr. Garey was to be handcuffed only in the front.[194]  Mr. Garey also told

Officer Nichols that the medical pass required officers to cuff Mr. Gary in the front.[195]

9.     Despite having a medical pass requiring correctional officers to handcuff Mr. Garey

in the front, Officer Nichols cuffed Mr. Garey behind the back.[196]

10.     Officer Nichols testified that he was not aware of Mr. Garey's medical pass at the

time Officer Nichols cuffed Mr. Garey.[197]  Officer Nichols conceded that Mr. Garey had a valid

medical pass on October 18, 2016, which dictated that Mr. Garey be handcuffed in the front.[198]

Recall that Mr. Garey arrived at the SHU late on October 17, 2016.[199]  Mr. Garey testified that he

was in the SHU for about eight to ten hours before he was cuffed.[200]  The record does not indicate

that Officer Nichols had occasion to learn of Mr. Garey's medical pass before Officer Nichols

observed Mr. Garey lying on his cell floor.  Nothing indicates that Officer Nichols had seen Mr.

Garey's medical pass or had been told by other officers that Mr. Garey had a medical pass.  The

only information Officer Nichols had with respect to Mr. Garey's medical pass came by way of

Mr. Garey telling Officer Nichols about the pass.  Before cuffing Mr. Garey, Officer Nichols did

---

[194] *Id.* at 73.

[195] *Id.* at 62.

[196] Mr. Garey testified that he told Officer Nichols that he was not supposed to be cuffed in the back, and that Officer Nichols nevertheless proceeded to cuff Mr. Garey behind his back.  *Id.* at 64.  In a declaration, Officer Nichols stated that he "was not the correctional officer who placed handcuffs on" Mr. Garey.  Pl.'s Ex. 44.  At the trial, however, Officer Nichols testified that he could not recall whether he was the one who placed handcuffs on Mr. Garey.  July 22, 2021 (PM) Tr. of Jury Trial at 115.  Officer Nichols also testified that he could not "remember when [Mr. Garey] was on the floor if he was cuffed from the front or from behind."  *Id.* at 118.  The Court finds that Officer Nichols was the correctional officer who handcuffed Mr. Garey, and the Court finds that Mr. Garey was handcuffed behind his back while he was on the floor.  Mr. Garey's certainty trumps Officers Nichols' equivocation as to this testimony. Unlike other portions of Mr. Garey's testimony, there is no embellishment concern here.

[197] *Id.* at 120–21.

[198] *Id.* at 120.

[199] *Id.* at 58.

[200] *Id.*

not ask Mr. Garey to produce his medical pass or otherwise attempt to confirm the existence of the medical pass.

11.     Officer Nichols was aware that medical passes issued to inmates indicate that an inmate was to be cuffed in the front only.[201]

12.     Mr. Garey testified that "[a]ny time you live in the SHU you are going to be cuffed."[202]  Mr. Garey testified that inmates without a medical pass were cuffed with their hands behind their backs.[203]

13.     Officer Nichols failed to "double lock" the handcuffs.[204]  If the handcuffs are not double locked, movement can cause the handcuffs to become tighter.[205]

14.     The officers had to lift Mr. Garey up.  Mr. Garey testified that "[o]ne [officer] grabbed the cuff.  Another [officer] grabbed my legs."[206]  Mr. Garey testified that Officer Nichols was the officer who grabbed him by the cuffs.[207]  Officer Nichols testified that he has "never lifted an inmate by their cuffs . . . ."[208]  The Court finds Officer Nichols' testimony on this point credible. The Court also finds that Mr. Garey had a motive to embellish this part of his testimony (that he was lifted by the cuffs) and that, based on his demeanor, he did embellish this part of his testimony. The Court concludes by a preponderance of the evidence that Officer Nichols did not lift Mr. Garey by the cuffs.

---

[201] *Id.* at 120.

[202] *Id.* at 63.

[203] *Id.*

[204] *Id.* at 76, 78.

[205] *Id.* at 130–31.

[206] *Id.* at 79.

[207] *Id.*

[208] *Id.* at 128.

15.     Mr. Garey testified that, as he was lifted up, "the cuffs got tighter and it caused me to scream in pain."[209]  The Court finds that, when the officers lifted Mr. Garey up to remove him from the cell, the handcuffs got tighter, causing Mr. Garey to "scream in pain."[210]

16.     The officers put Mr. Garey on a wheeled "medical bed" to take him to medical services.[211]  While he was on the wheeled medical bed, Mr. Garey had to lay on his side because he was handcuffed behind the back.[212]

17.     When Mr. Garey arrived at medical services, a medical services clinical encounter form states that he had "10/10 pain to back, left hip, headache, and bil[ateral] wrist due to wrist too tight.  Cuffs release and [inmate] stated wrists felt better."[213]  Mr. Garey explained that the form was "talking about observing the handcuffs being too tight on my arm.  Because what [the nurse] did[,] she tried to put something [like a pencil or pen] between and they wouldn't go through it."[214]

---

[209] *Id*. at 78.

[210] Mr. Garey claimed that when Officer Nichols and another officer lifted him up, "One grabbed the cuff. Another grabbed my legs."  *Id.* at 79.

[211] *Id.* at 65.  Mr. Garey testified that the officers put Mr. Garey on a wheeled "medical bed" to take him to medical services.  *Id.*  Officer Nichols testified, somewhat equivocally, "Well, if my memory serves me right when we escort him to medical, he was in a wheelchair."  *Id.* at 118.  Mr. Garey's certainty trumps Officers Nichols' equivocation as to this testimony.  Unlike other portions of Mr. Garey's testimony, there is no embellishment concern here.

[212] Mr. Garey said that, while he was on the wheeled medical bed, "I was hunched and I was on my side not face down but I was like my hand in back and I was laying on the side."  *Id.* at 65.  The Court takes this to mean that Mr. Garey was claiming that he was still handcuffed behind his back while he was being transported on the bed to medical services.  Officer Nichols testified that "[i]f [Mr. Garey] had would have been in a wheelchair [he] would have been cuffed in the front."  *Id.* at 118.  When asked if Mr. Garey "might have been cuffed from the back and then they moved it to the front when they put him in the wheelchair?" Officer Nichols again responded that he could not recall.  *Id.* at 118–19.  Mr. Garey's certainty trumps Officers Nichols' equivocation as to this testimony.  Unlike other portions of Mr. Garey's testimony, there is no embellishment concern here.

[213] Pl.'s Ex. 43.  *See also* July 22, 2021 (PM) Tr. of Bench Trial at 65–67.

[214] July 22, 2021 (PM) Tr. of Bench Trial at 67.  Officer Nichols explained that there should be about a finger-width of space between the handcuffs and an inmate's skin, stating that "[u]sually when I put a pair of handcuffs, I'll put my thumb kind of give it space.  I'll go around and that thumb will keep [a] gap there to where there's some wiggle room."  *Id.* at 129.

18.     It is unclear how much of Mr. Garey's pain was attributable to the fact that the handcuffs were tight and behind his back.  The Court finds that at least some of the pain and suffering was due to the tightness and location of the handcuffs.

19.     Officer Nichols removed the handcuffs after the physician assistant told Officer Nichols that the handcuffs were too tight.[215]

20.     Mr. Garey still had discernable marks or scrapes on his wrists from the handcuffs on October 27, 2017—nine days after the handcuffing took place.[216]

21.     Mr. Garey sought medical treatment on multiple occasions for wrist injuries stemming from this handcuffing incident.[217]

## B. Conclusions of Law

The United States argues that the doctrine of sovereign immunity bars all these claims.  In the alternative, the United States argues that Officer Nichols was not negligent and did not commit assault or battery.  The United States is wrong about sovereign immunity and wrong on the merits of the negligence claim.  But the United States is right on the merits of the assault and battery claims.

---

[215] *Id.* at 72.

[216] *Id.* at 74–76; *see also* Pl.'s Ex. 106.  Mr. Garey claimed that the handcuff marks were still visible on July 22, 2021, and showed his wrists to me during the trial.  July 22, 2021 (PM) Tr. of Jury Trial at 76–77.  To the extent I could see any mark at all, it was faint to the point of invisible.  Mr. Garey also testified that he went to a neurology doctor in October of 2017 (one year after the handcuffing incident), who conducted "some kind of nerve conductivity test" with "electronic probes."  *Id.* at 77.  Mr. Garey was diagnosed with mild to moderate carpal tunnel syndrome and mild bilateral sensory ulnar neuropathy.  *Id.*  Mr. Garey said that "I had never done one of those in my life. That was my first done."  *Id.*  Because it is not possible to tell from the evidence and testimony how much (if any) of this type of damage is attributable to the tight handcuffs, the Court finds that Mr. Garey did not meet his burden of proving that the carpal tunnel syndrome and ulnar neuropathy were caused by Officer Nichols' actions.

[217] *See* Pl.'s Ex. 43 (Mr. Garey reporting "10/10 pain to pack, left hip, headache and [bilateral] wrist due to wrist too tight"); Pl.'s Ex. 58-012 (showing that Mr. Garey visited medical services for wrist pain, hand numbness, and discolored skin stemming from this handcuffing incident); Pl.'s Ex. 31-001–002 (showing that on March 29, 2017, a medical provider x-rayed Mr. Garey's hands and wrists).

i.     Sovereign Immunity

There is no need to reinvent the wheel.  What I have said in Sections I(B)(i) and II(B)(i) above provide the framework for the sovereign immunity analysis.

With respect to the claim that Officer Nichols negligently handcuffed Mr. Garey behind his back and too tightly, this is not the type of action that falls within the discretionary function exception.  Prison policy dictates handcuffing a prisoner in the front *only* if that is required by a medical pass.[218]  As mentioned above, it was common knowledge among the Forrest City FCI correctional officers that an inmate with a medical pass was only to be cuffed in the front.  Mr. Garey had a valid medical pass dictating that he was only to be cuffed in the front.[219]  Officer Nichols admits as much.  So, Officer Nichols had "no rightful option but to" handcuff Mr. Garey in the front.[220]  Stated differently, Officer Nichols did not have discretion to handcuff Mr. Garey behind his back.[221]  On the behind-the-back handcuff issue, there is no need to proceed to step two.

With respect to the handcuffs being too tight, Officer Nichols' decision to apply the cuffs was not mandated by a specific policy and was "the product of judgment or choice (i.e., discretionary)."[222]  The same is true as to how tightly to apply the cuffs.  All this satisfies the first step of the discretionary-function-exception test.  But the way Officer Nichols applied the cuffs

---

[218] Pl.'s Ex. 106-06–07.

[219] Pl.'s Ex. 5.

[220] *Berkovitz*, 486 U.S. at 536.

[221] *Id.*  The Court could imagine that there might be unique circumstances where an Officer has discretion to cuff a prisoner behind his back even if the medical pass says front-cuffing only.  Neither Officer Nichols nor the United States argues that the Officer Nichols faced such a situation here.

[222] *Dykstra*, 140 F.3d at 795.

(too tightly) was not based on "social, economic, or political policy" considerations.[223]  Officer Nichols testified that he normally double locks handcuffs when restraining prisoners.  The Court has found that he did not do so on this occasion.  That failure was the kind of mistake that tort law was developed to address and not a "consideration[] of public policy."[224]  In short, the second step of the discretionary-function-exception test is not satisfied, which means the discretionary function exception does not apply with respect to either facet of the handcuffing incident.

With respect to the assault and battery claims, the law enforcement proviso applies and thus the discretionary function exception is inapplicable.  As was true for Officer White, the United States does not make any argument that Officer Nichols is not an investigative or law enforcement officer of the United States as that term is defined in the law enforcement proviso.  And, obviously, the law enforcement proviso makes plain that it applies to claims of assault and claims of battery.

    ii.    <u>Merits</u>

As mentioned in Section I(B)(ii), "[t]o prevail on a claim of negligence" in Arkansas, "the plaintiff must prove that the defendant owed a duty to the plaintiff, that the defendant breached the duty, and that the breach was the proximate cause of the plaintiff's injuries."[225]  "The question of the duty owed by one person to another is always a question of law . . . ."[226]  Officer Nichols owed Mr. Garey a duty to investigate whether Mr. Garey had a medical pass dictating front only handcuffing.  Officer Nichols also owed Mr. Garey a duty to abide by the medical pass and not handcuff Mr. Garey behind his back.  Finally, Officer Nichols owed Mr. Garey a duty to place handcuffs on him in a way that they would not be (or get) too tight.

---

[223] *Id.*

[224] *Gaubert*, 499 U.S. at 323.

[225] *Duran*, 2018 Ark. 33, at 6, 537 S.W.3d at 726.

[226] *Heigle v. Miller*, 322 Ark. 315, 321, 965 S.W.2d 116, 120 (Ark. 1998).

Officer Nichols breached each of the aforesaid duties.  Mr. Garey told Officer Nichols that Mr. Garey had a medical pass and that Mr. Garey was not to be handcuffed behind his back.[227] Recall that Mr. Garey was lying prone on the floor essentially immobilized.  He did not pose a threat to himself or Officer Nichols.  Time was not of the essence.  It would have taken but a moment for Officer Nichols to verify the veracity of Mr. Garey's statements.  Instead, Officer Nichols ignored Mr. Garey.[228]  Officer Nichols then handcuffed Mr. Garey behind his back, in direct contravention of the instructions on Mr. Garey's medical pass.  Officer Nichols (assuming he didn't put the cuffs on too tightly in the first place) failed to double lock the cuffs to ensure that the cuffs would not tighten when Mr. Garey was moved.[229]

These breaches proximately caused Mr. Garey to suffer damages.  Photographic evidence shows lacerations on Mr. Garey's wrists over a week after this incident.  And the Court does not doubt that, given Mr. Garey's overall condition, Mr. Garey experienced pain and suffering from both the tight cuffs and being cuffed behind his back.  Officer Nichols' conduct, "in a natural and continuous sequence, produce[d] damage and without which the damage would not have occurred."[230]  In other words, Mr. Garey has established causation and damages.  Officer Nichols acted negligently when he handcuffed Mr. Garey.

Mr. Garey is entitled to recompense.  But how much?  Traditional methods of damages calculations are not readily applicable here.  Take the medical records.  They simply provide a narrative of the treatment Mr. Garey sought and the treatment he received.  Nothing in the record shows dollar amounts associated with Mr. Garey's handcuff injuries.  And nothing indicates that

---

[227] July 22, 2021 (PM) Tr. of Bench Trial at 64.

[228] *Id.*

[229] *See id.* at 129 (explaining that failure to double lock handcuffs "could cause the cuffs to squeeze into your wrist").

[230] *Mangrum v. Pigue*, 359 Ark. 373, 383, 198 S.W.3d 496, 501 (Ark. 2004).

Mr. Garey paid for any treatment.  Mr. Garey has also failed to show that he suffered any permanent injuries for which he will have to seek treatment in the future.  Another traditional damages calculation, lost wages, is not helpful because Mr. Garey is unemployed; he did not lose wages as a result of his injuries.

Nonetheless, Mr. Garey experienced pain and suffering that he should not have endured. For that pain and suffering, Mr. Garey is entitled to judgment against the United States in the amount of $500.00.

Mr. Garey's assault and battery claims regarding Officer Nichols are a different story. Recall that Arkansas law defines assault as follows:

> an intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery.[231]

The Court concludes that Mr. Garey adduced no facts at trial to show that Officer Nichols intentionally attempted to injure Mr. Garey.  Nor did Mr. Garey establish that Officer Nichols attempted to commit a battery.

Recall also that Arkansas law defines battery as "a wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person."[232]  Under Arkansas law, the use of physical force necessary to control a detainee does not constitute a tort, even when the use of such force results in injury to the detainee.[233]  Under the restraint policy in place at Forrest City FCI, Officer Nichols was permitted to use handcuffs to transfer Mr. Garey to

---

[231] *Costner*, 82 Ark. App. at 156, 121 S.W.3d at170.

[232] *Id.*

[233] *Crouch*, 212 Ark. at 982, 208 S.W.2d at 462.

medical.   The handcuffing, then, was not a wrongful contact.   Nor was it "the unpermitted application of trauma" by Officer Nichols on Mr. Garey.   It is true that the Court found that Officer Nichols should have cuffed Mr. Garey in the front and should have ensured that the cuffs did not cinch too tightly, but that conduct constituted negligence and not the intentional tort of battery. The accidental tightness of the cuffs and the behind-the-back aspect of the cuffing don't convert an otherwise lawful contact into a wrongful or offensive contact.

### Conclusion

Judgment should be entered in favor of Eddie Milton Garey, Jr. (for $500) on his trial negligence claims regarding Clifford Nichols.   Judgment should be entered in favor of the United States on all trial claims regarding Quinton White and on the trial claims of assault and battery regarding Clifford Nichols.   The trial negligence claim regarding Stacey Hill is dismissed.   A separate judgment will accompany this Order.

IT IS SO ORDERED this 13th day of September 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE